## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| LISA COLE and CHARLESETTA JACKSON, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiffs, | CLASS ACTION |
| v. | JURY TRIAL DEMANDED |
| SUNFLOWER MEDICAL GROUP, P.A., | |
| Defendant. | |

## <u>CLASS ACTION COMPLAINT</u>

Plaintiffs Lisa Cole and Charlesetta Jackson ("Plaintiffs"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through their attorneys, bring this Class Action Complaint against Defendant Sunflower Medical Group, P.A. ("SMG" or "Defendant"), and complain and allege upon personal knowledge as to themselves and information and belief as to all other matters.

## <u>INTRODUCTION</u>

1.     Plaintiffs bring this class action against SMG for its failure to secure and safeguard approximately 220,968 individuals', including Plaintiffs', personally identifying information ("PII") and personal health information ("PHI"), including names, addresses, dates of birth, Social Security numbers, driver's license numbers, medical information, and health insurance information.

2.     SMG is a healthcare provider with four locations in the Kansas City, Kansas area.

3.     On or about December 15, 2024, an unauthorized third party gained access to SMG's network systems and acquired files containing the PII/PHI of SMG's patients, including Plaintiffs and Class members (the "Data Breach").

4.      SMG owed a duty to Plaintiffs and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. SMG breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its clients' customers' PII/PHI from unauthorized access and disclosure.

5.      As a result of SMG's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiffs' and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiffs bring this action on behalf of themselves and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred on or about December 15, 2024.

6.      Plaintiffs, on behalf of themselves and all other Class members, assert claims for negligence, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violation of the Kansas Consumer Protection Act, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## **PARTIES**

### *Plaintiff Lisa Cole*

7.      Plaintiff Lisa Cole is a citizen and resident of Kansas.

8.      Plaintiff Cole obtained healthcare services from SMG. As a condition of providing healthcare services to Plaintiff Cole, SMG required Plaintiff Cole to provide it with her PII/PHI.

9.      Based on representations made by SMG, Plaintiff Cole believed that SMG had implemented and maintained reasonable security and practices to protect her PII/PHI. With this

belief in mind, Plaintiff Cole provided her PII/PHI to SMG in exchange for receiving healthcare services from SMG.

10.    At all relevant times, SMG stored and maintained Plaintiff Cole's PII/PHI on its network systems, including the systems impacted in the Data Breach.

11.    Plaintiff Cole received a letter from SMG notifying her that her PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

12.    As a direct result of the Data Breach, Plaintiff Cole has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII/PHI.

### Plaintiff Charlesetta Jackson

13.    Plaintiff Charlesetta Jackson is a citizen and resident of Kansas.

14.    Plaintiff Jackson obtained healthcare services from SMG. As a condition of providing healthcare services to Plaintiff Jackson, SMG required Plaintiff Jackson to provide it with her PII/PHI.

15.    Based on representations made by SMG, Plaintiff Jackson believed that SMG had implemented and maintained reasonable security and practices to protect her PII/PHI. With this belief in mind, Plaintiff Jackson provided her PII/PHI to SMG in exchange for receiving healthcare services from SMG.

16.    At all relevant times, SMG stored and maintained Plaintiff Jackson's PII/PHI on its network systems, including the systems impacted in the Data Breach.

17.     Plaintiff Jackson received a letter from SMG notifying her that her PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

18.     Since the Data Breach, Plaintiff Jackson has experienced a significant increase in the number of spam calls she receives. Additionally, Plaintiff Jackson has spent time and effort researching the Data Breach and reviewing her accounts and financial information for signs of fraud or identity theft.

19.     As a direct result of the Data Breach, Plaintiff Jackson has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII/PHI.

***Defendant Sunflower Medical Group, P.A.***

20.     Defendant Sunflower Medical Group, P.A. is a Kansas professional association with its principal place of business located at 5675 Roe Blvd., Suite 100, Roeland Park, KS 66205. It may be served through its registered agent: Paul Kurth, 5555 W. 58th Street, Mission, KS 66202.

## JURISDICTION AND VENUE

21.     The Court has subject matter jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

22.     This Court has general personal jurisdiction over SMG because it is organized under the law of this State and maintains its principal place of business in this District.

23.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because SMG's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of SMG*

24.    SMG is a healthcare provider which offers services such as "primary care, urgent care, obstetrics and gynecology, laboratory tests, x-rays, EKG's, ultrasounds, vascular screens & bone density tests."[1] SMG serves the Kansas City metro area[2] from four locations in Roeland Park, KS, Lenexa, KS, and Kansas City, KS.[3]

25.    In the regular course of its business, SMG collects and maintains the PII/PHI of its patients, including Plaintiffs and Class members. SMG requires patients to provide it with their PII/PHI, including the PII/PHI stolen in the Data Breach, before it provides them healthcare services.

26.    On its website, SMG promises "we maintain the highest level of security to keep your health information private and secure."[4]

27.    SMG's website contains a Notice of Privacy Practices (the "Privacy Policy"), which describes how SMG may use and disclose its patients' PII/PHI.[5]

---

[1] *The Personal Health Care You Deserve*, SUNFLOWER MED. GRP., https://sunflowermed.com/ (last accessed Mar. 25, 2025).
[2] *Id.*
[3] *Health Clinic Locations*, SUNFLOWER MED. GRP., https://sunflowermed.com/locations/ (last accessed Mar. 25, 2025).
[4]    Our    Medical    &    Health    Care    Services,    SUNFLOWER    MED.    GRP., https://sunflowermed.com/kansas-city-health-care-services/ (last accessed Mar. 25, 2025).
[5]    *Notice    of    Privacy    Practices,*    SUNFLOWER    MED.    GRP.    (Nov.    10,    2013), https://sunflowermed.com/privacy-practices/ (last accessed Mar. 25, 2025) [hereinafter, the "*Privacy Policy*"].

28.    SMG represents to its patients that it will only use or disclose their PII/PHI without their "express consent or authorization" for certain limited purposes including, *inter alia*, treatment, payment, and health care operations purposes.[6] SMG promises patients it will "obtain your express written authorization before using or disclosing your information for any other purpose not described in" the Privacy Policy.[7]

29.    In the Privacy Policy, SMG admits it is "required by law to maintain the privacy of protected health information, to provide individuals with notice of its legal duties and privacy practices with respect to protected health information, and to notify affected individuals following a breach of unsecured protected health information."[8]

30.    Plaintiffs and Class members are current or former patients of SMG who entrusted their PII/PHI to SMG in exchange for healthcare services.

### The Data Breach

31.    On or about January 7, 2025, SMG "became aware of suspicious activity within its computer network."[9] Following an investigation, SMG "determined that an unknown third party accessed [SMG]'s systems on or about December 15, 2024 and, during that time, acquired copies of files from [SMG]'s systems."[10] The files accessed and stolen in the Data Breach contained the PII/PHI of Plaintiffs and Class members, including names, addresses, dates of birth, Social Security numbers, driver's license numbers, medical information, and health insurance information.[11]

---

[6] *Id.*
[7] *Id.*
[8] *Id.*
[9] *Notice of a Data Security Incident*, SUNFLOWER MED. GRP., https://sunflowermed.com/data-security-incident/ (last accessed Mar. 25, 2025).
[10] *Id.*
[11] *Id.*

32.    The notorious Rhysida ransomware group claimed responsibility for the Data Breach and has added SMG to its dark web extortion website.[12] The Rhysida ransomware group stated "the stolen information was available to the highest bidder."[13] Among the PII/PHI stolen from SMG and posted for sale on Rhysida's dark web leak site is "a 3 terabyte SQL database allegedly belonging to Sunflower Medical Group containing more than 400,000 driver's licenses, insurance cards and Social Security numbers."[14]

33.    The Rhysida group engages in "'double extortion'—demanding a ransom payment to decrypt victim data and threatening to publish the sensitive exfiltrated data unless the ransom is paid."[15] In double extortion ransomware attacks, the cybercriminals "exfiltrate a victim's sensitive data in addition to encrypting it," which makes this type of attack "especially dangerous."[16]

34.    While SMG learned of the Data Breach on or about January 7, 2025, SMG waited until approximately March 7, 2025—two months after first discovering the Data Breach—to begin notifying its patients that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.[17] SMG still has not notified Plaintiffs and Class members that

---

[12] Steve Alder, *Cyberattack on Sunflower Medical Group Affects 221,000 Patients*, HIPAA J. (Mar. 11, 2025), https://www.hipaajournal.com/cyberattack-on-sunflower-medical-group-affects-221000-patients/.

[13] Solomon Klappholz, *More than 300,000 US healthcare patients impacted in suspected Rhysida cyber attacks*, IT PRO (Mar. 11, 2025), https://www.itpro.com/security/cyber-attacks/us-healthcare-cyber-attacks-sunflower-medical-group.

[14] Marianne Kolbasuk McGee, *Rhysida Hacking Group Strikes More Healthcare Providers*, GOV'T INFO. SEC. (Mar. 10, 2025), https://www.govinfosecurity.com/rhysida-hacking-group-strikes-more-healthcare-providers-a-27677.

[15] *#StopRansomware: Rhysida Ransomware*, CYBERSEC. AND INFRASTRUCTURE SEC. AGENCY (Nov. 15, 2023), https://www.cisa.gov/news-events/cybersecurity-advisories/aa23-319a.

[16] *What Is Double Extortion Ransomware?*, ZSCALER, https://www.zscaler.com/resources/security-terms-glossary/what-is-double-extortion-ransomware (last accessed Mar. 25, 2025).

[17] *See Sunflower Medical Group, P.A.*, OFF. ME. ATT'Y GEN. (Mar. 7, 2025), https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/e2ac36fe-8544-4e52-b422-c482bf738652.html (last accessed Mar. 25, 2025).

their PII/PHI was stolen by a notorious gang of cybercriminals or that it has been posted for sale on the dark web.

35.    SMG's failure to promptly notify Plaintiffs and Class members that their PII/PHI was accessed, stolen, and posted for sale on the dark web virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiffs and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiffs and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### *SMG Knew that Criminals Target PII/PHI*

36.    At all relevant times, SMG knew, or should have known, that the PII/PHI that it collected and stored was a target for malicious actors. Indeed, SMG states in its Privacy Policy that it will alert patients in the event of a breach of their PII/PHI. Despite such knowledge, SMG failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class members' PII/PHI from cyberattacks that it should have anticipated and guarded against.

37.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[18]

---

[18] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

38.     Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[19] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[20]

39.     PII/PHI is a valuable property right.[21] The value of PII/PHI as a commodity is measurable.[22] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[23] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[24] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

40.     As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data

---

[19] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed Mar. 25, 2025).

[20] *See id*.

[21] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[22] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[23] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[24] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

41.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[25] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[26]

42.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[27] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[28]

43.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[29] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted

---

[25] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019),        https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[26] *Id.*

[27] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[28] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[29] Steager, *supra* note 25.

disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[30]

44.    Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[31]

45.    Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

46.    Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[32] [33]

---

[30] *Id.*

[31] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[32] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Mar. 25, 2025).

[33] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

47.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[34]

48.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[35]

49.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[36] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[37] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[38] The FTC also warns, "If the thief's health information is mixed with yours it

---

[34] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[35] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Mar. 25, 2025).

[36] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[37] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 28.

[38] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Mar. 25, 2025).

could affect the medical care you're able to get or the health insurance benefits you're able to use."[39]

50.     A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

    a.  Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

    b.  Significant bills for medical goods and services neither sought nor received.

    c.  Issues with insurance, co-pays, and insurance caps.

    d.  Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

    e.  Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

    f.  As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

    g.  Phantom medical debt collection based on medical billing or other identity information.

    h.  Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own. [40]

51.     There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately

---

[39] *Id*.
[40] *See* Dixon & Emerson, *supra* note 36.

three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[41]

52.      It is within this context that Plaintiffs and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

### *Damages Sustained by Plaintiffs and Class Members*

53.      Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## CLASS ALLEGATIONS

54.      This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

55.      Plaintiffs bring this action on behalf of themselves and all members of the following Class of similarly situated persons:

---

[41] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019), http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

All persons whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

56.    Excluded from the Class are Sunflower Medical Group, P.A., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

57.    Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

58.    The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. SMG has reported that the Data Breach affected approximately 220,968 persons.[42]

59.    Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

   a.    Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and Class members' PII/PHI from unauthorized access and disclosure;

   b.    Whether Defendant had a duty not to disclose the PII/PHI of Plaintiffs and Class members to unauthorized third parties;

   c.    Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiffs' and Class members' PII/PHI;

   d.    Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiffs and Class members;

   e.    Whether Defendant breached its duties to protect Plaintiffs' and Class members' PII/PHI; and

---

[42] *Sunflower Medical Group*, *supra* note 17.

      f.   Whether Plaintiffs and Class members are entitled to damages and the measure of such damages and relief.

60.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs, on behalf of themselves and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

61.    Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all proposed members of the Class, had their PII/PHI compromised in the Data Breach. Plaintiffs and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiffs' claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

62.    Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs are adequate representatives of the Class in that they have no interests adverse to, or that conflict with, the Class they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

63.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all

parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

**CAUSES OF ACTION**

**COUNT I**
**NEGLIGENCE**

64.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

65.    SMG owed a duty to Plaintiffs and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

66.    SMG knew or should have known the risks of collecting and storing Plaintiffs' and all other Class members' PII/PHI and the importance of maintaining secure systems. SMG knew or should have known of the many data breaches that targeted companies that collect and store PII/PHI in recent years.

67.    Given the nature of SMG's business, the sensitivity and value of the PII/PHI it maintains, and the resources at its disposal, SMG should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

68.    SMG's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

69.    SMG duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as

17

interpreted by the FTC, the unfair act or practice by a business, such as SMG, of failing to employ reasonable measures to protect and secure PII/PHI.

70.    SMG violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and other Class members' PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. SMG's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiffs and the other Class members.

71.    SMG's violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

72.    Plaintiffs and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

73.    The harm occurring as a result of the Data Breach is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiffs and Class members as a result of the Data Breach.

74.    SMG breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls,

policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiffs' and Class members' PII/PHI.

75.    It was reasonably foreseeable to SMG that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiffs' and Class members' PII/PHI to unauthorized individuals.

76.    But for SMG's negligent conduct or breach of the above-described duties owed to Plaintiffs and Class members, their PII/PHI would not have been compromised.

77.    As a result of SMG's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in SMG's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

<u>**COUNT II**</u>
**BREACH OF FIDUCIARY DUTY**

78.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

79.    Plaintiffs and Class members gave SMG their PII/PHI in confidence, believing that SMG would protect that information. Plaintiffs and Class members would not have provided SMG with this information had they known it would not be adequately protected. SMG's acceptance and storage of Plaintiffs' and Class members' PII/PHI created a fiduciary relationship between SMG and Plaintiffs and Class members. In light of this relationship, SMG must act primarily for the benefit of its patients, which includes safeguarding and protecting Plaintiffs' and Class members' PII/PHI.

80.    Due to the nature of the relationship between SMG and Plaintiffs and Class members, Plaintiffs and Class members were entirely reliant upon SMG to ensure that their PII/PHI was adequately protected. Plaintiffs and Class members had no way of verifying or influencing the nature and extent of SMG's data security policies and practices, and SMG was in an exclusive position to guard against the Data Breach.

81.    SMG has a fiduciary duty to act for the benefit of Plaintiffs and Class members upon matters within the scope of their relationship. It breached that duty by failing to properly protect the integrity of the system containing Plaintiffs' and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiffs' and Class members' PII/PHI that it collected.

82.    As a direct and proximate result of SMG's breaches of its fiduciary duties, Plaintiffs and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication,

and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in SMG's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT III**
**BREACH OF IMPLIED CONTRACT**

83.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

84.    In connection with receiving healthcare services, Plaintiffs and all other Class members entered into implied contracts with SMG.

85.    Pursuant to these implied contracts, Plaintiffs and Class members paid money to SMG, directly or through their insurance, and provided SMG with their PII/PHI. In exchange, SMG agreed to, among other things, and Plaintiffs and Class members understood that SMG would: (1) provide services to Plaintiffs and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class members' PII/PHI; and (3) protect Plaintiffs' and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

86.    The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Class members, on the one hand, and SMG, on the other hand. Indeed, as set forth above, SMG recognized the importance of data security and the privacy of its patients'

PII/PHI. Had Plaintiffs and Class members known that SMG would not adequately protect their PII/PHI, they would not have received healthcare or other services from SMG.

87.    Plaintiffs and Class members performed their obligations under the implied contract when they provided SMG with their PII/PHI and paid for healthcare or other services from SMG.

88.    SMG breached its obligations under its implied contracts with Plaintiffs and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI, and in failing to implement and maintain security protocols and procedures to protect Plaintiffs' and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

89.    SMG's breach of its obligations of its implied contracts with Plaintiffs and Class members directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class members have suffered from the Data Breach.

90.    Plaintiffs and all other Class members were damaged by SMG's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and incurred money to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they overpaid for services that were received without adequate data security.

## <u>COUNT IV</u>
## UNJUST ENRICHMENT

91.     Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

92.     This claim is pleaded in the alternative to the breach of implied contract claim.

93.     Plaintiffs and Class members conferred a monetary benefit upon SMG in the form of monies paid to SMG for healthcare services and through the provision of their PII/PHI.

94.     SMG accepted or had knowledge of the benefits conferred upon it by Plaintiffs and Class members. SMG benefitted from the receipt of Plaintiffs' and Class members' PII/PHI, as this was used to provide healthcare services and facilitate billing services.

95.     As a result of SMG's conduct, Plaintiffs and Class members suffered actual, measurable damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures, that Plaintiffs and Class members paid for, and those payments without reasonable data privacy and security practices and procedures, that they received.

96.     SMG should not be permitted to retain the money belonging to Plaintiffs and Class members because SMG failed to adequately implement the data privacy and security procedures for itself that Plaintiffs and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

97.     Plaintiffs and Class members have no adequate remedy at law.

98.     SMG should be compelled to provide for the benefit of Plaintiffs and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

<u>COUNT V</u>
**VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT ("KCPA")**
**K.S.A. §§ 50-623, *et seq.***

99.    Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

100.    K.S.A. § 50-626(a) states, "No supplier shall engage in any deceptive act or practice in connection with a consumer transaction."

101.    SMG is a supplier under the KCPA pursuant to K.S.A. § 50-624(l).

102.    The healthcare services that SMG provided to Plaintiffs and Class members are "consumer transactions" pursuant to K.S.A. § 50-624(c).

103.    The services that SMG provides are "services" within the meaning of K.S.A. § 50-624(k).

104.    SMG made representations to Plaintiffs and Class members that their information would remain confidential, particularly in their Privacy Policy.

105.    SMG did not disclose to Plaintiffs and Class members that its data security was inadequate.

106.    SMG committed deceptive acts or practices in violation of the KCPA through their failure to adequately safeguard and maintain Plaintiffs and Class members' PII/PHI.

107.    SMG committed deceptive acts or practices by making at least the following representations regarding its data security with reason to know they were false:

    a.    property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have (K.S.A. § 50-626(b)(1)(A));

    b.    property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation (K.S.A. § 50-626(b)(1)(D)); and

      c.     property or services has uses, benefits or characteristics unless the supplier relied upon and possesses a reasonable basis for making such representation (K.S.A. § 50-626(b)(1)(F)).

108.    As a result of SMG's above-described conduct, Plaintiffs and Class members have suffered damages from the disclosure of their information to unauthorized individuals.

109.    The injury and harm that Plaintiffs and the other Class members suffered was the direct and proximate result of SMG's violations of the KCPA. Plaintiffs and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in SMG's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

110.    Plaintiffs, individually, and for each member of the Class, seeks damages for their injuries pursuant to K.S.A. § 50-634(d) and attorneys' fees, litigation expenses and court costs pursuant to K.S.A. § 50-634(e).

## PRAYER FOR RELIEF

Plaintiffs, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in their favor and against Defendant as follows:

A.      Certifying the Class as requested herein, designating Plaintiffs as Class Representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.      Awarding Plaintiffs and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.      Awarding Plaintiffs and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and the Class, seek appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.      Awarding Plaintiffs and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.      Awarding Plaintiffs and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.      Awarding Plaintiffs and the Class such other favorable relief as allowable under law.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury of all claims in this Class Action Complaint so triable.

Dated: March 26, 2025                          Respectfully submitted,

/s/ Michael T. Yonke
Michael T. Yonke, No. 16998
**YONKE LAW LLC**
700 W. 47th Street, Suite 550
Kansas City, MO 64112
Tel: 816.221.6400
Fax: 816.888.5188
myonke@yonke-law.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiffs*

**Pro hac vice* forthcoming